## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DON MASTERS,  derivatively and on behalf of VIATRIS INC.<br><br>                   Plaintiff,<br><br>        v.<br><br>MICHAEL GOETTLER, W. DON CORNWELL, ROBERT J. COURY, JOELLEN LYONS DILLON, NEIL DIMICK, MELINA HIGGINS, JAMES KILTS, HARRY A. KORMAN, RAJIV MALIK, RICHARD A. MARK, MARK W. PARRISH, PAULINE VAN DER MEER MOHR, and IAN READ,<br><br>              Defendants,<br><br>              and<br><br>VIATRIS INC.,<br><br>              Nominal Defendant. | Civil Action No.:  2:23-cv-1553<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Don Masters ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Viatris Inc. ("Viatris" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Michael Goettler ("Goettler"), W. Don Cornwell ("Cornwell"), Robert J. Coury ("Coury"), JoEllen Lyons Dillon ("Dillon"), Neil Dimick ("Dimick"), Melina Higgins ("Higgins"), James Kilts ("Kilts"), Harry A. Korman ("Korman"), Rajiv Malik ("Malik"), Richard A. Mark ("Mark"), Mark W. Parrish ("Parrish"), Pauline van der Meer Mohr ("van der Meer Mohr"), and Ian Read ("Read") (collectively, the "Individual Defendants," and together with Viatris, the "Defendants") for breaches of their

fiduciary duties, as directors and/or officers of Viatris. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commissions ("SEC") filings, wire and press releases published by and regarding Viatris, news reports, securities analysts' reports and advisories about the Company, litigation documents involving the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action seeking to remedy wrongdoing committed by the current and former members of the Board of Directors ("Board") of Viatris for their breaches of fiduciary duties and violations of the federal securities laws, as well as other misconduct, which resulted in substantial damage to Viatris as well as its shareholders.

2.     Viatris, a global pharmaceutical company, engages in the provision of access to medicines and sustainable operations. It also offers support services such as diagnostic clinics, educational seminars, and digital tools.

3.     Viatris was created through a merger between Mylan N.V. ("Mylan") and Pfizer Inc.'s Upjohn division (the "Merger") in November 2020. In public filings after the Merger, the Company laid out a multi-phase transformation plan and touted its ability to leverage its unique and differentiated business model, including a valuable biosimilars portfolio, *i.e.*, medicines highly similar to other marketed biologics, to deliver long-term durable top line growth.

4.      Defendant Goettler, the Company's Chief Executive Officer ("CEO") at the time and other Viatris officers and directors repeatedly represented to the financial markets that an adjusted EBITDA of $6.2 billion for 2021 was the floor for Viatris' business going forward, that fiscal 2021 was a "trough year," and that the Company was committed to continued investment in its biosimilars business.

5.      In February 2022, Viatris disclosed the truth regarding its transition plans.  In a complete departure of  the   frequently repeated plan to invest in Viatris' biosimilars portfolio, Viatris announced the sale of its biosimilars portfolio.  The previously issued financial guidance was substantially reduced, falling short of even the "trough" of $6.2 billion in EBITDA reported for fiscal 2021.

6.      The public, including investors and financial analysts, were surprised by the unexpected announcement, causing the Company's stock price to plummet by 24% over a three-day period.

7.      Accordingly, the Individual Defendants' wrongful conduct caused the initiation of various investigations and actions including, but not limited to two securities class actions against Viatris, and certain of its directors and officers.  As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, as well as its directors and officers.

8.      As a result of the Individual Defendants' breaches of fiduciary duty and other misconduct, Viatris has been damaged and has suffered, and will continue to suffer, a loss of reputation and goodwill.  Through this action, Plaintiff seeks to recover for the Company its damages and remediate the internal control weaknesses that afflict Viatris.

9.       Plaintiff did not make a demand on the Board. Further detailed herein, a demand

would have been a futile and useless act. Demand is excused because each member of the Board faces a substantial likelihood of liability for the misconduct alleged herein.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise and pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1); and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9); and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

11.     This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States of America.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

15.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Individual Defendants have conducted business in this District, and the Individual Defendant's actions have had an effect in this District. In addition, Viatris maintains its headquarters in this District.

## PARTIES

### Plaintiff

16.     Plaintiff is a current shareholder of Viatris stock. Plaintiff has continuously held Viatris common stock at all relevant times.

### Nominal Defendant Viatris Inc.

17.     Viatris is a Delaware corporation whose shares trade on NASDAQ under the ticker symbol "VTRS." The Company's principal executive offices are located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania 15317.

### Defendant Goettler

18.     Defendant Goettler served as CEO of Viatris and a Viatris Director from 2020 until his resignation on April 1, 2023. As of October 24, 2022, Defendant Goettler owned 137,155 Viatris shares.

19.     For the fiscal year ended December 31, 2020, Defendant Goettler received $5,472,905 in compensation from the Company. This included $871,875 in salary, $2,400,000 in stock awards, $1,000,000 in bonuses, $951,675 in non-equity incentive plan compensation, and $249,355 in all other compensation. For the fiscal year ended in December 31, 2021, Defendant Goettler received $14,669,592 in compensation from the Company. This included $1,300,000 in salary, $9,100,015 in stock awards, $3,716,115 in non-equity incentive plan compensation, and $553,462 in all other compensation.

### Defendant Cornwell

20.     Defendant Cornwell has served as a Viatris Director since 2020 and is a member of the Audit Committee and Risk Oversight Committee. As of October 24, 2022, Defendant Cornwell owned 22,197 Viatris shares.

21.     For the fiscal year ended in December 31, 2021, Defendant Cornwell received $370,003 in compensation from the Company. This included $150,000 in fees earned or paid in cash, $200,003 in restricted stock units ("RSUs"), and $20,000 in all other compensation.

**Defendant Coury**

22.     Defendant Coury has served as a Director of Viatris since 2020 and is Chair of the Executive Committee.  Defendant Coury owns 1,061,659 Viatris shares.

23.     For the fiscal year ended December 31, 2020, Defendant Coury received $29,057,376 in compensation from the Company. This included $1,800,000 in salary, $12,451,936 in stock awards, $10,000,000 in bonuses, $4,405,590 in non-equity incentive plan compensation, and $399,850 in all other compensation. For the fiscal year ended in December 31, 2021, Defendant Coury received $18,552,078 in compensation from the Company. This included $1,800,000, $10,800,010 in stock awards, $5,145,390 in non-equity incentive plan compensation, and $806,678 in all other compensation.

**Defendant Dillon**

24.     Defendant Dillon has served as a Director of Viatris since 2020, Chair of the Governance and Nominating Committee and is a member of the Audit Committee, Compliance Committee, and Executive Committee.  As of October 24, 2022, Defendant Dillon owned 39,564 Viatris shares.

25.     For the fiscal year ended December 31, 2021, Defendant Dillon received $400,003 in compensation from the Company. This included $200,000 in fees earned or paid in cash, and $200,003 in RSUs.

**Defendant Dimick**

26.     Defendant Dimick was a Director of Viatris from 2020 until 2022, Chair of the

Audit Committee, and a member of the Compensation Committee, Executive Committee, and Finance Committee.  As of October 24, 2022, Defendant Dimick owned 75,200 Viatris shares.

27.     For the fiscal year ended in December 31, 2021, Defendant Dimick received $420,003 in compensation from the Company. This included $200,000 in fees earned or paid in cash, $200,003 in RSUs, and $20,000 in all other compensation.

**Defendant Higgins**

28.     Defendant Higgins has served as a Director of Viatris since 2020, Chair of the Compensation Committee and Finance Committee, and a member of the Governance and Nominating Committee.  As of October 24, 2022, Defendant Higgins owned 137,068 Viatris shares.

29.     For the fiscal year ended in December 31, 2021, Defendant Higgins received $445,003 in compensation from the Company. This included $225,000 in fees earned or paid in cash, $200,003 in RSUs, and $20,000 in all other compensation.

**Defendant Kilts**

30.     Defendant Kilts has served as a Director of Viatris since 2020 and a member of the Compensation Committee and Finance Committee. As of October 24, 2022, Defendant Kilts owned 78,277 Viatris shares.

31.     For the fiscal year ended in December 31, 2021, Defendant Kilts received $370,003 in compensation from the Company. This included $150,000 in fees earned or paid in cash, $200,003 in RSUs, and $20,000 in all other compensation.

**Defendant Korman**

32.     Defendant Korman has served a Director of Viatris since 2020, Chair of the Risk Oversight Committee, and a member of the Compliance Committee, Governance and Nominating

Committee, and Science and Technology Committee. As of October 24, 2022, Defendant Korman owned 50,638 Viatris shares.

33.     For the fiscal year ended in December 31, 2021, Defendant Korman received $375,003 in compensation from the Company. This included $175,000 in fees earned or paid in cash, and $200,003 in RSUs.

**Defendant Malik**

34.     Defendant Malik has served as President of Viatris and is a Director of Viatris since 2020. Defendant Malik is a member of the Science and Technology Committee. As of October 24, 2022, Defendant Malik owned 881,315 Viatris shares.

35.     For the fiscal year ended in December 31, 2020, Defendant Malik received $14,101,983 in compensation from the Company. This included $3,655,769, $6,210,015 in stock awards, $2,500,000 in bonuses, $690,001 in options awards, $2,358,386 in non-equity incentive plan compensation, $336,290 in changes in pension value and non-qualified deferred compensation earnings, and $851,522 in all other compensation. For the fiscal year ended in December 31, 2021, Defendant Malik received $11,622,250 in compensation from the Company. This included $1,200,000 in salary, $7,200,017 in stock awards, $2,858,550 in non-equity incentive plan compensation, and $363,683 in all other compensation.

**Defendant Mark**

36.     Defendant Mark has served as the President of Viatris, a Director of Viatris since 2020, Chair of the Audit Committee, and a member of the Finance Committee and Risk Oversight Committee. As of October 24, 2022, Defendant Mark owned 33,165 Viatris shares.

37.     For the fiscal year ended in December 31, 2021, Defendant Mark received $370,003 in compensation from the Company. This included $150,000 in fees earned or paid in cash,

$200,003 in RSUs, and $20,000 in all other compensation.

**Defendant Parrish**

38.     Defendant Parrish has served as a Director of Viatris since 2020, Chair of its Compliance Committee, and a member of its Audit Committee, and Governance and Nominating Committee.  As of October 24, 2022, Defendant Parrish owned 82,250 Viatris shares.

39.     For the fiscal year ended in December 31, 2021, Defendant Parrish received $450,003 in compensation from the Company. This included $250,000 in fees earned or paid in cash, and $200,003 in RSUs.

**Defendant van der Meer Mohr**

40.     Defendant van der Meer Mohr has served as a Director of Viatris since 2020 and a member of its Compensation Committee, Compliance Committee, and Risk Oversight Committee. Defendant van der Meer Mohr owned 20,543 Viatris shares.

41.     For the fiscal year ended in December 31, 2021, Defendant van der Meer Mohr received $350,003 in compensation from the Company. This included $150,000 in fees earned or paid in cash, and $200,003 in RSUs.

**Defendant Read**

42.     Defendant Read was a Director of Viatris from 2020 until 2022, Chair of the Science and Technology Committee, and a member of the Compliance Committee. As of October 24, 2022, Defendant Read owned 14,497 Viatris shares.

43.     For the fiscal year ended in December 31, 2021, Defendant Read received 375,003 in compensation from the Company. This included $175,000 in fees earned or paid in cash, and $200,003 in RSUs.

## THE DUTIES OF THE INDIVIDUAL DEFENDANTS

44.    By reason of their positions as officers and/or directors of Viatris and because of their ability to control the business and corporate affairs of Viatris, the Individual Defendants owed and owe Viatris and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Viatris in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Viatris and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

45.    The Individual Defendants, because of their positions of control and authority as directors and officers of Viatris, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

46.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on NASDAQ, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Viatris' financial condition, operations, products, internal controls, and business prospects.  In addition, the Individual Defendants had a duty to cause Viatris to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.  In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Viatris' management, policies, and internal controls.

47.    At all times relevant hereto, the Individual Defendants were the agents of each other and Viatris and were always acting within the course and scope of such agency.

48.    The Individual Defendants were and are also subject to particularized duties

pursuant to specific policies in effect at Viatris.

### *The Individual Defendants' Duties Under The Company's Code of Business Conduct and Ethics*

49.     Viatris' Code of Business Conduct and Ethics ("Code of Conduct") applies to "all Viatris directors, officers, and employees."

50.     The Code of Conduct requires the reporting of any violation of the Code of Conduct to an immediate supervisor, Human Relations Business Partner, the Legal Department, or the Compliance Department.

51.     The Code of Conduct discusses the importance of complete, truthful, and accurate recordkeeping:

> All Viatris personnel must comply with all established internal controls at all times. We must accurately enter all assets, liabilities, revenues and expenses of Viatris in the company's regular books, records and other standard financial documents.  We are all required to record and report all data and information accurately and honestly.  This applies to every business record or document that you prepare or contribute to as part of a team.

52.     The Code of Conduct prohibits making false statements or false claims to government entities and requires compliance with all relevant laws:

> Many laws prohibit making false statements or false claims to government officials and entities.  There potentially can be severe civil and criminal penalties, both for you personally and for Viatris, if you violate these laws.
>
> If you prepare or contribute to any business record, or represent or certify to the accuracy of the information contained in such records, you must be diligent in assuring their accuracy and complete integrity.
>
> All Viatris personnel must comply with all established internal controls at all times. We must accurately enter all assets, liabilities, revenues and expenses of Viatris in the company's regular books, records and other standard financial documents. These books, records and documents also must accurately reflect and properly describe the transactions they record.

53.     The Code of Conduct requires full, fair, accurate, truthful, and timely public

disclosures:

> Viatris is committed to delivering accurate information when communicating with the investment community, regulators, the media and other interested parties, and to making full, fair, accurate, truthful, timely and understandable disclosures in all public reports and filings made pursuant to law or regulation.  We are responsible for ensuring that information which will or may be part of a financial statement or related filing is accurate, complete and meets all legal requirements.

54.   Defendant Goettler, as the CEO of Viatris, had additional duties under the Company's Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Corporate Controller ("Code of Ethics") including, to: (i) engage in honest and ethical conduct; (ii) endeavor to make, and to promote the making by others of, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company; (iii) comply with applicable governmental laws, rules, and regulations; and (iv) report promptly any violations of the Code of Ethics to a responsible member of management.

### *Duties for Audit Committee Members*

55.   The Audit Committee sets forth additional duties for members of the Audit Committee and provides that members are obligated to assist the Board in its oversight of, among other things, the Company's risk management practices and policies; the integrity of the Company's financial statements; the Company's compliance with legal and regulatory requirements; and the effectiveness and performance of the Company's internal audit function.

56.   The Audit Committee members are required to, among other things:

- Review the scope, conduct, and findings of any financial or internal control related audit performed by the independent auditor;

- At least annually, review the organization, responsibilities, plans, performance (including the performance of the Head of Internal Audit), and scope and resources of the Internal Audit function, and discuss the performance of the Head of Internal Audit with the Chief Financial Officer;

- Review the annual audited financial statements and quarterly financial statements, and financial information to be included in related public releases and SEC filings with management (including the Internal Audit group) and the independent auditor, including the Company's Quarterly Report on Form 10-Q and Annual Report on Form 10-K;

- Review with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the quality and adequacy of the Company's internal control over financial reporting, including (1) management's report on the effectiveness of the Company's internal control over financial reporting; (2) the independent auditor's report on its audit of the effectiveness of the Company's internal control over financial reporting; and (3) the Company's disclosure controls and procedures, including their effectiveness;

- Review and discuss with management (including the Head of Internal Audit) and the independent auditor, as appropriate, the Company's processes and procedures with respect to risk assessment and risk management of financial and disclosure control- related, as well as reporting related, matters.

### *Duties of Governance and Nominating Committee Members*

57.     The Charter of the Governance and Nominating Committee sets forth additional duties for its members, including obligations relating to oversight over the development and adequacy of the Corporate Governance Principles, including, recommending to the Board corporate governance principles applicable to the Company, and reviewing and making recommendations to the Board for revisions to the Corporate Governance Principles at least annually.

### *Duties of Risk Oversight Committee Members*

58.     The members of the Risk Oversight Committee are required to oversee the Company's enterprise risk management framework.

59.     The Risk Oversight Committee Charter requires that its members:

- Review the enterprise risk framework, infrastructure, and controls implemented by management to help identify, assess, manage and monitor

the Company's material risks.

- Review management's exercise of its responsibility to identify, assess, and manage material risks not allocated to the Board or another Committee.

- Review the Company's efforts to foster a culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation.

- Report to the Board on a periodic basis regarding the status of the Company's enterprise risk management framework, including structure and implementation, the most significant risks and how these are managed, and recommendations, if any, that any risk related oversight responsibilities should be delegated to, or reviewed by, other committees of the Board.

- At its discretion, and no less than semi-annually, consult with the Chairs of the other Board Committees to discuss risk-related matters delegated to those Committees and the Company's enterprise risk management framework, and report the results of those discussions to the full Board.

- Monitor relevant trends and developments in the area of enterprise risk management and oversight.

### *Duties of Compliance Committee Members*

60.     The members of the Compliance Committee are responsible to oversee the Chief Compliance Officer's implementation of the Company's Corporate Compliance Program, report to the Board from time-to-time as to the status of the Corporate Compliance Program, and, as appropriate, make recommendations to the Board and/or management with respect to the formulation or re-formulation of, and the implementation, maintenance and monitoring of, the Corporate Compliance Program, the Code of Business Conduct and Ethics, and significant related global policies designed to support and promote compliance with Company requirements, and legal rules and regulations.

61.     The Compliance Committee Charter requires that its members:

- Review significant global compliance-related policies implementing the Company's Code of Business Conduct and Ethics, or related to the operations of the Company's business, and its mode or methods of doing business, including, for example, policies relating to pricing and/or

commercialization of the Company's products and services.

- Review metrics used by management or requested by the Committee to provide insight into the status and efficacy of the Compliance Program, including the Company's global compliance systems and organization.

- Review reports of significant actual and alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations, including all reports of significant alleged violations by "executive officers", as that term is defined in Rule 3b-7 promulgated under the Securities Exchange Act of 1934, and any related disciplinary actions.

- Review checks and balances implemented by the Company designed to support and promote compliance with approved corporate policies, legal rules, and regulations.

- Review standards and procedures implemented by the Company designed to help reduce the potential for violation of corporate policies and legal rules and regulations, and the communication of such standards and procedures to employees and external agents as appropriate.

- Periodically report on the status and efficacy of the Compliance Program, the Committee's meetings, actions and recommendations to the Board, or as otherwise requested by the Board.

## SUBSTANTIVE ALLEGATIONS

### *Background*

62.     Viatris is a pharmaceutical company which develops, produces, and sells branded, generic, complex generic, biosimilar, and over the counter medication.  Viatris is also one of the leading producers of active pharmaceutical ingredients ("API") responsible for the therapeutic effects of medicines.  On November 16, 2020, Viatris was formed through the Merger which was a business combination between Mylan N.V. and Pfizer Inc.'s Upjohn division.

### *Viatris Lays Out a Multi-Phase Transformation Plan*

63.     On January 14, 2021, at the 39th Annual JPMorgan Virtual Healthcare Conference, the Company revealed its "Clear Execution Roadmap to Optimize Total Shareholder

Return." The Company's multi-phased plan was intended in the near-term to provide a "stable revenue base," realize more than a billion dollars in cost synergies by the end of 2024, improve cash conversion and cash flow, sufficiently deleverage its debt to be able to pay two and half times its fixed expenses, and pay out at least 25% of the Company's free cash flow in dividends.[1] In the long term, the plan was intended to grow revenue and dividends and increase financial flexibility.

64.     On March 1, 2021, Viatris published a press release about a virtual Investor's Day event to discuss its financial condition and business prospects. The press release quoted Defendant Goettler regarding the transformation plan, in part:

> Building on a strong, combined foundation, we are embarking on a multi-year journey to transform our company. We believe that we are well positioned to achieve our goals by leveraging our strengths and unique capabilities. We are relentless in our commitment to continuous improvement and high quality. Our obsession to create value in everything we do will serve as our north star.
>
> *       *       *
>
> We are confident we will be able to pursue our mission to empower people worldwide to live healthier at every stage of life while maintaining a strong balance sheet, rebalancing our business, generating strong and growing free cash flows, rapidly de-leveraging and building the foundation for future growth fueled by our Global Healthcare Gateway.

65.     Further in the press release, Viatris touted its unique and differentiated business model, stating in part:

> Viatris has built a unique and differentiated business model that has enhanced global scale and geographic reach, a sustainable, diverse and differentiated portfolio and pipeline, a powerful operating platform and commercial capabilities, a performance-driven culture focused on transparency and accountability and sustainable cash flows that it expects will enable disciplined capital allocation.

66.     In the press release, Viatris noted that 2021 was a "trough year" for the Company, announced one billion dollars in synergies in three years, and the intent to repay approximately

---

[1] https://viatris.gcs-web.com/static-files/0c1c75c4-a012-4d0a-a34c-e557efbe5b80.

$6.5 billion in debt by the end of 2023, stating in part:

> In the near term Viatris is focused on de-levering and rebalancing its business and meeting its financial commitments, including that 2021 is expected to be ***a trough year in terms of revenue, adjusted EBITDA and free cash flows***, that the company will realize ***$1 billion in synergies within 3 years*** and that its strong and growing free cash flow will enable the company to initiate a dividend in the second quarter of this year and ***repay approximately $6.5 billion in debt by the end of 2023***. [2]

67.     At the Investor's Day event, Defendant Goettler described the first phase of Viatris' plan, focusing over the next three years "on delivering and rebalancing our business to lead and exceed expectation."  Again, 2021 was described as a "trough year."  Defendant Goettler touted the Company's research and development pipeline, particularly in connection with the Company's biosimilars business, and emphasized the return to "***long-term durable*** top line growth and operating leverage."  Goettler laid out the Company's three guiding principles in relation to the plan: "execution, transparency and accountability."

68.     Defendant Malik, referring to the biosimilars and complex generics market, stated that Viatris had "already shown that we have those core competencies to excel in this space." Malik highlighted the Company's "first-to-market successes like generic Advair, generic to the Advair, generic to the Copaxone, biosimilar to Neulasta, biosimilar to Herceptin, and I can go on." Malik stated that the Company viewed the biosimilars business as a "global franchise," and reiterated Viatris' commitment "to invest in the biosimilar development programs," noting that "we will be extremely focused on our efforts to be the first to the market and believe we are well positioned for several of our key programs in the future."  Malik stated that Viatris was positioned to be a "***long-term leader*** in [the biosimilars] space."

69.     Anthony Mauro ("Mauro"), President of Viatris' Developed Markets business segment stated that the Company "expected to see historical low to mid-single digit erosion

---

[2] All emphasis herein is added unless otherwise noted.

continue" but reassured that the erosion would be offset by "new launches and volume growth[.]" Mauro also called biosimilars a "long-term investment strategy" for the Company, with growth in "both developed market regions on a year-over-year basis."  Mauro further emphasized Viatris' "effective and efficient infrastructure."  Mauro touted Viatris as a "market leader in complex generic products, where we rank #1 in value, volume and total prescriptions for products like Wixela, glatiramer acetate, and XULANE."

70.    Walt Owens ("Owens"), Viatris' Global Head of Research and Development, also stated that one of the Company's "key strategic pillars" was "expanding our biosimilars platform with an emphasis on being first." Owens stated that Viatris had a "forward-looking focus on biosimilars" which well positioned the Company for "execution in this critical strategy element."

71.    At the Investor's Day event, Defendant Malik also represented that the Individual Defendants were "instilling the right internal conditions, disciplines to manage and maximize the business[.]" Malik reiterated that 2021 was a "trough year" and that the Company was well positioned to execute by managing its base business and erosion "in a more diligent way":

> Our disciplined approach to understanding our profit growth potential on a granular level and strategically managing our resource allocation, coupled with a rigorous performance management process focused on execution and results, gives us the tremendous confidence in our ability to meet our stated objectives.
>
> *        *        *
>
> I hope by hearing from this team gave you enough insight to appreciate ***why we are confident that we can manage our base business, manage its erosion in a more diligent way.***  We're extending the profitable life of our existing products and proactively responding to the country-specific changes in our market structure and environment.
>
> *        *        *
>
> When taking all of these pieces into consideration, you should have an appreciation about ***our confidence in '21 being a trough year.***

72.    Defendant Goettler responded to an analyst questioning Viatris' confidence that

2021 was only a trough year: "We have all the levers in place now to be very confident to say that '21 is a trough year[;] a trough year on revenue, a trough year on EBITDA and definitely a trough year on cash flow."

73.     When a UBS Investment Bank analyst questioned whether new products could "offset business erosion beyond 2021 on the EBITDA line," Defendant Malik responded with confidence in the Company's ability to manage the erosion:

> [L]ook, one of the reasons we wanted to make sure, first of all, you guys get comfortable about the '21 being the trough year. That was one of the objective[s] today. The second objective was we give you insight into this platform and show you the potential of not only these new launches or the revenue synergies offsetting the base erosion, but also our proactively trying to manage the erosion because…if you can erase the decline of 1% tail products, that takes off the pressure of your new product launches     So there are many levers.

74.     On Viatris' biosimilars division long-term growth, Defendant Goettler stated that the Company had "no intention [of getting] out of biosimilars, quite the opposite" and Defendant Malik represented Viatris was in that business for the "long-term":

> [W]e will keep on looking for the partnerships, and we'll keep on building our own competencies.  So it's an area for us where we have said this is a global franchise. ***This is an area where we have decided to hang in, not get out.  And for us, it's a long-term play,*** and we continue to make the R&D investments, as well as investments in our commercial infrastructure.  Because we are very excited [about] what we see ahead in this growing space. So that's my two cents view on the biosimilars.

### *Viatris Continues to Misrepresent its Ability to Meet its Financial Goals and the Long-Term Nature of its Biosimilars Segment*

75.     On March 10, 2021, in a conference call with financial analysts and investors, Defendant Goettler again represented that 2021 was a "trough year" for revenue, EBITDA, and cash flow, confirming that "clearly means it's not going to go lower than this."

76.     Goettler discussed the Company's guidance from the Investor's Day event,

noting the difference between "special items" and the Company's ongoing business and the Company's ability to offset erosion:

> [A] lot of the special items like the Lyrica LOE in Japan, like the performance LOE, these will not—obviously not repeat. In fact, we have no major LOE ahead of us. Lyrica is the last big one. No major LOE in the planning horizon that's in excess of $100 million…. So what you're left with is the underlying base business.

> In the base business, there's a natural erosion. We quantified that for our 2021 guidance. It doesn't mean necessarily that it will be like this every year, right? We have a very different commercial infrastructure now. We've got medical skills. We can get—we believe we can get more out of the base business that we have.

> Then you have -- offsetting that erosion, we have new product launches. Again, that number is not written in stone. We've been running at about an average of about $600 million in new product revenue every year. Maybe we can get some more out of that by launching more, launching better.

77.     Defendant Malik stated that biosimilars was a "core strategic area" for Viatris and "we will be looking forward to build the core competencies, which we have been working on." Malik explained that the biosimilars space would "continue to be one of the key growth drivers as we launch more and more of these products in more geographies."

78.     On May 10, 2021, Viatris filed with the SEC a Current Report on Form 8-K that attached a press release reporting the financial results for the first quarter of 2021. In the press release, Defendant Goettler emphasized Viatris' "strong first quarter performance across revenue, adjusted EBITDA and free cash flow" which "highlights the diversified and robust business profile that differentiates Viatris as a company." Goettler reaffirmed guidance for 2021, which "incorporates known and potential headwinds and tailwinds for the remainder of the year." Malik also stated that the Company was "off to a strong start to the year as we successfully execute on our 2021 business plan priorities," and "on track to realize approximately $500 million of cost synergies this year."

79.     Later that day, in a conference call with financial analysts and investors, Defendant Goettler emphasized the "strong first quarter results which validate the success of a diversified and robust business that can absorb any headwinds in any individual part of the business while seizing market opportunities."  Goettler concluded his opening remarks by confirming the "underlying strength in our business" and reaffirming the 2021 guidance. Defendant Malik stated that the Company "was off to a great start" with its execution of the 2021 plan, including "minimizing the base business erosion, executing the new launches and integrate and synergize."

80.     Defendant Malik represented that the Company's U.S. generics business accounted for 11% of the Company's total business and highlighted the Company's "disciplined approach" to resource allocation and portfolio management:

> Our current generics portfolio is now a combination of diversified product forms, including extended-release oral solids, injectables, transdermals, and topicals.  We implemented our disciplined approach to resource allocation and portfolio management, including the rationalization of negative margin products.  We believe that extending this approach to our overall business will help us manage our base business more effectively.  Looking ahead, we have assumed increased competition for our complex products like XULANE, Wixela, glatiramer acetate in addition to the loss of exclusivity of performance.

81.     When Defendant Malik was questioned about Viatris' base business erosion, which had dropped lower than the Company's guidance, he reassured that the Company's underlying business "across the geographies, whether I start with the China talk about the Developed Markets,[3] North America, Europe" was strong.  Defendant Malik added: "I think the approach we had adopted to manage this base is the key.  And our focus will be to optimize, leverage and minimize the base."

82.     Defendant Goettler was asked whether the Company's 2021 revenue was a "trough," and responded that the Company was "highly confident" of $6.2 billion in EBITDA as

---

[3] The Company defines "Developed Markets" as its business in the United States and Europe.

the "floor" because "we know all the levers we can have" and "we know the robustness of our

business and our EBITDA [so] you can put any leverage." Goettler stated confidently: "Free cash

flow, high confidence again because we clearly see the growth coming driven by EBITDA and

lower onetime costs. On revenue, we've got a good understanding of the base erosion…. We have

a good understanding of the new pipeline revenue we can bring." Goettler later reaffirmed: "We

continue to remain confident that '21 is our trough year. And we gave a definition of that. The

definition is $6.2 billion in EBITDA as our floor going forward." Goettler also focused on Viatris'

"broad and diverse product portfolio that includes brands, complex and biosimilars and generics."

83.     On August 9, 2021, the Company filed with the SEC its Current Report on Form

8- K that attached a press release from that day announcing Viatris' financial results for the second

quarter of 2021. In the press release, Defendant Goettler touted "another quarter of strong results,"

and stated that "we are executing at a high level across the entire business," and "have strong

momentum going into the second half of 2021."

84.     In a conference call with financial analysts and investors that day, Defendant

Goettler represented that the Company was on track to meet its guidance:

> This high level of performance enables us to continue to deliver on our
> commitments. We've paid down $1.15 billion in debt year-to-date, and we're well
> on track to achieve $6.5 billion in debt repayment by 2023. In June, we returned
> value to shareholders by paying our first quarterly dividend of $0.11 per share, and
> the Viatris Board has declared another $0.11 per share dividend for the next quarter.
> And we're on track to achieve $500 million in synergies this year and on track for
> at least $1 billion by the end of 2023.

85.     Indeed, Defendant Goettler announced that the Company was *raising* its

guidance "across revenue, adjusted EBITDA, and free cash flow," reiterating that "$6.2 billion in

adjusted EBITDA" was the "true floor of our business going forward."

86.     Goettler stated that he was confident about the execution of the transformation

plan: "We continue to manage this business, and we're getting more and more confident, actually, in our ability, not only to deliver against the plan, but also improve free cash flow conversion, in addition to the strength you get from the underlying business[.]"

87.     In a response to a financial analyst questioning Viatris' "key growth drivers" in the biosimilars segment, Defendant Goettler noted that Viatris' "biosimilar portfolio is strong," and stated that it would be "a driver of growth going forward and something to be very proud of."

88.     When asked about the 2022 fiscal year, Goettler confirmed the "$6.2 billion true floor for this business," emphasizing that "I think with the performance we have under our belt now from both the first and the second quarter, it's more clear than ever to us that that's the case." Regarding revenue, Defendant Goettler stated that "we feel good about where we are."

89.     On November 8, 2021, the Company filed with the SEC a Current Report on Form 8-K attaching a press release reporting the financial results for the third quarter of 2021.  In the press release, Defendant Goettler stated: "Our continued strong operational performance for three consecutive quarters has allowed us to continue to deliver on our financial commitments and, based on the strength of our results, we are again raising our full-year financial guidance for 2021." Goettler also promised further detail on "our two-phased strategic roadmap" at an upcoming virtual Investor Event.  Malik touted the Company's pipeline and clinical programs, "including *biosimilars*, complex generics and novel medicines," which we expect will enable us to continue to deliver value, especially after synergies roll off at the end of 2023."

90.     On a conference call with financial analysts and investors regarding the third quarter financial results, Defendant Goettler touted the Company's performance in its biosimilars division, including filing the first biosimilar registration of a medicine to treat macular degeneration.  Goettler emphasized that the strong biosimilars performance "enables us to continue

to execute on Phase I of our strategic road map, which is expected to be completed by the end of 2023." Goettler represented that the Company was on track with Phase I of its strategic plan: "We're now 1 year into that 3-year effort, and we continue to deliver on our financial commitments with debt repayment, dividend and synergies."

91.     Defendant Goettler again raised the Company's financial guidance for total revenue, adjusted EBITDA, and free cash flow claiming that "we are near completion of our rigorous bottom-up strategic planning effort." Goettler reiterated that "we continue to remain confident that $6.2 billion of adjusted EBITDA is the true floor of our business."

92.     Defendant Malik discussed the planned Investors Event, where the Company would provide a "comprehensive review of the significant value and the depth of our pipeline and clinical programs, including biosimilars, complex generics and our medicines that we have been strategically building over many years," noting that "[t]hese development programs are expected to play a significant role in our ability to drive organic growth over time, especially as our cost synergies roll off at the end of 2023."

93.     Defendant Malik gave more detail on Viatris' generics and biosimilars business which performed "in line with our expectations," with global biosimilars portfolio growth of 14%, which "helped to offset anticipated competition related to select complex generics products." Malik pointed to strong performance in biosimilars in North America "which was better than our expectations," and stated that "our price erosion for this quarter is mid-single digits and very much in line with our expectations." Malik later confirmed that erosion was in line with expectations: "[I]f we normalize the onetime events like Tecfidera's LOE or loss of the exclusivity of Wixela and XULANE lane, we are right at where we forecasted, mid-single-digit price erosion." Chief Financial Officer ("CFO") Sanjeev Narula ("Narula") backed up Malik's assertions regarding base

business erosion in the North American generics business: "These items are tracking in line with our expectation, and full year assumption is unchanged at approximately 4%."

94.     Defendant Goettler reconfirmed $6.2 billion as the floor for adjusted EBITDA, stating in part:

> [T]hat's a floor that's very, very important because that drives how we can deliver on Phase I, right? We laid out our clear priorities, what we need to do. EBITDA drives cash flow, it's not the only thing that's driving cash flow, it's one of the things driving cash flow, and remain confident that the EBITDA, combined with, and you can easily do the math yourself, $8 billion or more in cash flow over those 3 years, sets us up to deliver on our Phase I commitments. We remain confident we can do so.

95.     Defendant Goettler reassured analysts that the Company was on track for $500 million in targeted synergies in the near term and $1 billion in synergies over the next three years. Defendant Goettler responded to a question about "the key tailwinds and headwinds" for 2022 and 2023:

> We're near completion of a very rigorous, very thorough, high-quality, bottom-up strategic planning process. And that really gives us increased confidence in understanding all the pushes and pulls of the business.
>
> *       *       *
>
> And on the upside, it is the pipeline, the upcoming launches. I think we're going to lay out to you on Investor Day how the pipeline is really one of the most underappreciated assets that we have and our ability to generate really, really strong cash flow. So, we're confident in our ability to deliver on all of our Phase I commitments that we laid out. And it gives us -- going to give us a great start for Phase II and look forward to telling you about Phase II when we come to the investor event.

96.     On December 1, 2021, at the Evercore ISI HealthCONx Conference, Defendant Goettler doubled down on the Company's two-phase transformation plan, stating in part:

> I think our strategy has been very clear we laid it out, right? We break it into 2 phases, what we call Phase 1 with year '21, '22, '23. And what we want to focus on there is on delivering, on paying back our debt, on growing the dividend and delivering on the integration and the synergies. We're well on track for that, and

we're strongly committed to that.

97.     Goettler discussed the Company's biosimilars pipeline as the "catalyst for the growth in Phase II," noting that it was "underappreciated" and that the Company had "some very strong investments in biosimilars, in complex generics" that would drive the continued growth.

98.     Defendant Malik gave more color on the biosimilars pipeline, pointing to the continued launch of new products and their impact:

> As we go into '23, '24, it's more than one over there . . .whether it's a BOTOX coming in '25, '26, whether it's coming to EYLEA. So those launches, I think, the concentration of those complex launches starts building up. And also, you would see the contribution of '22, '23 launches is not going to fade out.

99.     Defendant Malik commented on the durability of Viatris' base business: "So I'm very excited to share with you guys on the Investor Day what are the catalysts for Phase 2 and how they're going to contribute . . . my feel is, once we do all that math, ***it's going to make our base business relatively more durable than it was yesterday or . . .today.***"

100.    Defendant Goettler again provided the $6.2 billion adjusted EBITDA as the "floor," which "allows us to deliver" the Company's Phase I commitments despite "pushes and pulls":

> We've got inflationary pressures. We've got the FX, we've got all these things. But taking all of them into account . . . we remain confident that the $6.2 billion we put out there as a floor, continues to be the floor. And that's really for EBITDA, adjusted EBITDA. And that's really an important number because that floor of adjusted EBITDA allows us to deliver on our commitment, allows us to generate $8 billion or more in cash flow over the 3 years. And with that, pay down the debt and grow the dividend, which is a commitment that we had for the Phase I. So I think that's the bottom line picture here. There are lots of pushes and pulls on that, but we're very confident in delivering on that.

### ***The Company Announces the Sale of the Biosimilars Business and Reduced Guidance***

101.    On February 28, 2022, Viatris filed with the SEC a Current Report on Form 8-K that attached a press release announcing that the Company was selling its biosimilars business. In

a related conference call with financial analysts and investors, the Company unexpectedly announced it would be selling its biosimilars business to Biocon Biologics Limited ("Biocon") for more than $3.3 billion, which was expected to close in the second half of 2022. The Company also announced reduced 2022 guidance, including $5.8-6.2 billion in adjusted EBITDA.

102.    On the conference call held the same day, Defendant Goettler announced "a significant global reshaping initiative," including a revamped transformation plan with the biosimilars sale as "the first-but-critical step to unlock value and reshape Viatris."

103.    Defendant Goettler attempted to spin the revamped transformation plan as a continuation of the original plan with a "goal to enhance our proven scientific capabilities and current global platform … to create a durable and higher-margin portfolio of products." To this end, Goettler reported that the Company would be focusing on three core global therapeutic areas, ophthalmology, gastrointestinal and dermatology. Goettler stated: "Viatris of the future is simpler, stronger and more focused."

104.    Defendant Goettler also announced that the Company would be selling off other assets beyond the biosimilars portfolio, stating in part:

> To unlock value and to simplify our business beyond the Biocon biosimilar transaction, we've identified other select assets, which we expect will unlock additional value. And as we continue to execute against our plan, we will become more efficient, reduce complexity and make Viatris a simpler, stronger and more focused company.

105.    Defendant Malik provided more detail on the sale of the assets: "These assets have the potential to unlock the trapped value and are potentially noncore to the future direction of the company. These assets can generate up to approximately USD 9 billion of pretax total proceeds." Malik echoed Defendant Goettler's claim that the Company was attempting to become "simpler, stronger, and more focused."

106.    Defendant Malik discussed the revised guidance and presented the lower target for adjusted EBITDA, a reduced $17.0-17.5 range for total revenue, and a $2.5-2.9 billion range for free cash flow.

107.    A JPMorgan analyst questioned whether the Company's strategy made "financial sense," and asked what "triggered this whole process," wondering about the radical shift as it was a "departure from kind of the broader portfolio that was created with the original Upjohn-Mylan transaction."  Defendant Goettler argued that the Company was still a "broad-based business," despite selling off the biosimilars segment and was merely trying "to add some innovative growth engine to it."  Goettler stated: "We continue to be involved in the biosimilars business just in a different way by having the 12.9%...in the future Biocon Biologics, with the upside potential that comes with this."

108.    Goettler touted the benefits of the deal including being "better positioned for success by being vertically integrated" and called the biosimilars portfolio "noncore to the future" of Viatris: "It's a question of is it core and noncore for the future of our business going forward?" Goettler refused to name which additional assets were on the chopping block: "So obviously, we're not, at this point, disclosing what they are for reasons, for integrity of the process, for competitive reasons, et cetera.  We'll disclose that as we come closer to it. But again, it's driven by the same motivation.  It's…unlocking of value."

109.    Defendant Malik defended the Company's reshaping of its portfolio: "[I]t's a continuation of the vision we had or the direction we had ….So it's continuing on that path, number one." In stark contrast to his earlier public statements, Malik downplayed the importance of the biosimilars business to Viatris:

> We took a hard look on some products. What products make sense? What products don't make sense? . . . We are taking a hard look on the businesses. We are evaluating what are the must-haves as we go along, what fit[s] in with the long- term strategy and maybe some other focus player…can put more value to that.

110.    A Barclays Bank analyst questioned the revised guidance, stating in part: "[Y]ou had called out $6.2 billion as the floor in the last call? ***And that seems to be the higher end of the range now.*** So what's changed to have this delta and believe that this includes the biosimilars business as part of 2022[?]" Defendant Goettler skirted the question by focusing on future growth:

> All eyes now really are on that future for us, right? And '22, '23 really should think about its execution years, continuing to being committed to our Phase I objectives of debt paydown, of dividend growth, of $8 billion in cash flow, of synergies, et cetera, we continue to be absolutely committed to that. But then really, it's about executing against the initiatives that we have laid out in 2022 and 2023 to build that future for Viatris '24 and onwards and return this business to growth. That's what it really was about.

111.    On the conference call, CFO Narula blamed the lowered adjusted EBITDA on "industry-wide" factors not unique to Viatris:

> There are 2 important factors that are not unique to Viatris, but that's the industry-wide. First is obviously foreign exchange. Our business is 70% international business. As you know, as seen second half of last year and beginning of this year, dollar has strengthened. Key currency that we have is euro and yen. So that all is causing at about a 2% headwind on our EBITDA and I showed that in the chart, that's about $120 million. So that's one factor.
>
> The second factor is the inflation on the input cost. This is on the third-party supply, whether it's the solvents, the—all the third-party procured APIs, distribution cost, all that is causing an increase in the cost, which is again an industry-wide, and I tried to clarify that on the chart. That's about $196 million. So, these factors, again, put together, is causing the -- have been considered in coming out of the guidance, where you see the midpoint is at $6 billion.

112.    A Bank of America Securities analyst wondered about the sudden "divestures" and questioned the Company's explanation for failing to meet the EBITDA guidance:

> So I think it sounds like the plan would be to get rid of some of the lower-quality, low-margin businesses that -- at multiples that are well above the current blended

company multiples. So, I just wanted to confirm that. And where are you at in terms of the process with these divestitures? It sounds like in order to put out a slide deck like this, presumably, you guys are pretty far along to have gotten some line of sight that these valuation multiples are truly attainable. Just trying to get a sense if you have conviction in these numbers and these multiples?

\*       \*       \*

And then just on the EBITDA, if I could come back to that for a second. I guess the Street perceives you guys as guiding to beat based on last year. ***And so just trying to get a sense of conservatism because, yes, perhaps costs went up, but you had the opportunity to pull forward cost synergies.***

113.    In response, Defendant Malik repeated that the Company was focused on what "was core and not core," and CFO Narula again emphasized that the EBITDA was impacted by inflation and foreign exchange.

114.    A Sanford C. Bernstein & Co. analyst questioned the Company's expectations for long term base business erosion:

> First of all, the baseline business. I'm aware that the generic business typically has its kind of a 5% erosion rate, but I was thinking that your international off-brand business is a lot more stable than that. Is the 5% you're giving us just a result to your projection for 2022? Or should we just think long term about that international business on existing products as facing a 5% erosion over time?

115.    Defendant Malik answered the base business erosion question with a segment-by-segment analysis:

> [I]f I say that if you put all the businesses together, that's where we are saying that blended erosion is around 4%, 5%. That's the 5% you are talking. And you're right, generics can have a component of 5%, 6%, and the LOEs have maybe 3% to 4%, not exactly at that level. And I'll tell you, I mean I'm pleasantly surprised by how much we have been able to hold it in 1 year, because of the -- and I'm not looking at this as an excuse. I think this is going to be a year when we are going to be out there in a normalized way when our people can get out and all that. So there has been some movements over there. ***But I would say roughly, you should look into the brands at about 2%, 3%, 4%.*** Japan is a one key one where the price erosion on these brands is a significant one, and we have that. So, if you come out of the Japan and go to emerging markets and all that, it's not that much. So once we, I think, bottom out that, that's one piece.

116.    The Sanford Bernstein analyst also questioned the Company's sudden shift in

strategy and how Viatris could compete with much larger companies with bigger budgets:

> And then second, you're kind of doing a kind of a big shuffle here, I was kind of under the impression that your strategy was, we have this global presence, we're just going to license products from SMID companies and put that on that basis and that will be our strategy. And now you seem to be kind of shifting this to focus on specific 3 areas, one of which you would probably pick. Is that full strategy is simply not viable? Can we simply not take therapeutic-agnostic products and launch them globally using your infrastructure?

> And following up on that, you began to talk about it why you're picking the products, the strategy, the area you're picking. Just for us who follow big pharma, those are hypercompetitive areas. Can you just tell us a little bit more granularity why -- where in those areas you're going to compete just because otherwise, you look like you're just competing with much larger companies with much bigger R&D budgets?

117.     Defendant Goettler responded by touting the Company's new "focused approach" versus the diversified portfolio the Company had been pushing since January 2021 when it introduced its multi-phase transformation plan:

> I mean, Ronny, we're not walking away from anything here. There's absolutely -- we're going to be a company that's balanced, right? That has a balance of generics, complex generics, off-patent brands. And what we're into -- at now is this innovative, higher-margin, more durable portfolio   ***And if you do that, if you go into that innovative space, you have to do it in a focused way. You cannot build therapeutic area leadership by having -- being in 7 different therapeutic areas. You get benefits from having commonality of customers, connection with scientific community, development expertise.*** That's the fly we were trying to build here.

118.     When another analyst wondered if EBITDA would "be flat or growing over time," Defendant Goettler refused to provide long-term guidance:

> On the EBITDA, look, we're not -- we're giving you '22 guidance. We're not giving long-term guidance at the moment because of all the moving pieces…. Our intent is to move this company to the future, beyond 2024, have returned to growth and make this durable higher-margin portfolio. That's where we're shifting it. Whether growth comes in '24 or later, at this point, I think it's too early to comment on.

119.     Following the announcement of the adjusted guidance and sale of the biosimilars portfolio, Viatris' stock dropped approximately 24% in three days, falling from a close of $14.54

on February 25, 2022 to a close of $11.01 per share on February 28, 2022.

120.     On February 27, 2023, Viatris filed with the SEC a Current Report on Form 8-K that announced that Defendant Goettler would resign as CEO and as a member of the Board as of April 1, 2023.  The Company also announced the appointment of Scott A. Smith ("Smith") as the new CEO of the Company effective April 1, 2023.

121.     The separation agreement with Defendant Goettler attached to the Form 8-K detailed the lucrative terms of his departure, including an $8,125,000 separation payment, a pro rata annual bonus for 2023, accrued and vested benefits under the Company's 401(k) plan, $125,000 for any unused and accrued vacation time, and continued health and welfare benefits for three years following the separation.

### *The Company's False and Misleading Proxy Statement*

122.     On October 28, 2022, Viatris filed a Proxy Statement with the SEC (the "2022 Proxy Statement").  The 2022 Proxy Statement solicited stockholders to, among other things, elect Defendants Cornwell, Korman, Malik, and Mark to the Viatris Board and approve executive compensation.  The 2022 Proxy Statement was issued by order of the Board and signed by Defendants Coury and Goettler.

123.     The 2022 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

> The Board, in turn, directly or through its committees, oversees the implementation of risk management and mitigation processes.  The Board and its committees rigorously review with management the risk management program and discuss risk assessment matters at least quarterly, as well as during the Board's annual budget review and approval process.  Each of our committees has full access to officers and employees of the Company, and our Board and committees also meet without members of management present.

124.     The 2022 Proxy Statement represented that the Audit Committee is engaged in

vigorous oversight over risks to the Company, the adequacy of the Company's internal controls, and compliance with all legal and regulatory requirements:

> The Audit Committee focuses on risks relating to financial and disclosure controls, SEC reporting matters, and oversight of Viatris' internal audit function and independent registered public accounting firm. The Committee oversees, among other matters, the Company's processes and procedures relating to risk assessment and risk management relating to financial, disclosure, and SEC reporting-related matters, and reviews with management the quality and adequacy of the Company's internal control over financial reporting. Viatris' internal audit function reports to and meets with the Committee at least quarterly to discuss potential risk or control issues, and the Committee regularly discusses the performance of the internal audit function, and the adequacy of resources available to this function. The Committee also meets quarterly with Viatris' independent registered public accounting firm in executive session.

125.    The 2022 Proxy Statement represented that the Governance and Nominating Committee "makes recommendations to the Board with respect to the Corporate Compliance Program, the Code of Business Conduct and Ethics . . . and is responsible for reviewing reports of significant actual or alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations."

126.    The 2022 Proxy Statement represented that the Risk Oversight Committee assists the Board in its oversight of Viatris' enterprise risk management framework:

> The Committee reviews the enterprise risk framework, infrastructure, and controls implemented by management to help identify, assess, manage, and monitor the Company's material risks; reviews management's exercise of its responsibility to identify, assess, and manage material risks not allocated to the Board or another committee . . . oversees management's activities with respect to CSR; and reviews the Company's efforts to foster a culture of risk-adjusted decision-making without constraining reasonable risk-taking and innovation.

127.    The 2022 Proxy Statement represented that the Board engages in robust corporate governance practices and promotes a shareholder-centric business model:

> Our shareholder-centric model is rooted in the Board of Directors ("Board") and management's commitment to on-going, robust dialogue to discuss and solicit shareholder feedback on key strategic, operational, financial, governance, and

executive compensation topics, and to address other topics of importance to shareholders.

*      *      *

Viatris' Board is firmly committed to robust oversight and good corporate governance. . .

128.    The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the 2022 Proxy Statement, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that Viatris was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding  its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

129.    On December 9, 2022, Viatris filed with the SEC a Current Report on Form 8-K announcing, among other things, the reelection of Defendants Cornwell, Korman, Malik and Mark to the Board and the approval of the 2021 executive compensation pursuant to the solicitations in the 2022 Proxy Statement.

### *Viatris is Sued in Securities Class Action Lawsuits*

130.    On May 12, 2023, a securities class action lawsuit was filed in the United States District Court for the Western District of Pennsylvania captioned *Taylor v. Viatris Inc., et al.*, No. 2:23-cv-00812-MJH (W.D. Pa. 2023) against the Company, Defendants Goettler and Malik, as well as Narula, Mauro, and Owens, alleging violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act.  The lawsuit seeks damages on behalf of a class consisting of all persons and entities that

purchased, or otherwise acquired, Viatris common stock between March 1, 2021 and February 25, 2022, inclusive, and alleges that the defendants misrepresented that: (i) 2021 was a "trough year" for Viatris; (ii) $6.2 billion was the adjusted EBITDA "floor" for Viatris; (iii) its biosimilars business was a core part of the Company's long-term investment strategy; (iv) it was managing resource allocation to meet its Phase I objectives and manage Viatris' base business erosion; (v) base business erosion was being and would continue to be offset by new product launches, including those in its biosimilars business; and (vi) base business erosion was in line with the publicly-given financial guidance.

131.    On June 15, 2023, a second securities class action lawsuit was filed in the United States District Court for the Western District of Pennsylvania captioned *McCord v. Viatris Inc., et al*, No. 2:23-cv-01098-MJH (W.D. Pa. 2023), against the same defendants making substantially similar claims.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

132.    Plaintiff brings this action derivatively and for the benefit of Viatris to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Viatris, as well as the aiding and abetting thereof.

133.    Viatris is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.    Plaintiff is, and has been at all relevant times, a stockholder of Viatris.  Plaintiff will adequately and fairly represent the interests of Viatris in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

135.    Demand upon the Board to institute this action against the Individual Defendants

would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

### Defendant Cornwell

136.     Defendant Cornwell received $370,003 in 2021 in compensation in the form of fees and stock awards for service as a director in 2021.  Cornwell earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW Cook's 2021 director compensation survey, [4] the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000.  As such, Cornwell earns over 32% more than an average director at a similarly sized company.

137.     Cornwell authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

138.     Cornwell benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing re-election to the Board of Viatris through the false and misleading statements and material omissions in the 2022 Proxy Statement.

139.     Cornwell has a long-standing business relationship with several of the Individual Defendants including Goettler, Read, and Kilts, which prevents him from acting in an independent and disinterested manner.  Cornwell and Kilts were members of the Board of Directors of Pfizer, Inc. from 1997 until the Merger. Defendant Goettler, Viatris' former CEO, served in various leadership roles at Pfizer since 2012, including his most recent role as Group President of Pfizer's Upjohn division from 2019 until the closing of the Merger.  Defendant Read served in leadership roles in his more than forty years at Pfizer, serving as Executive Chairman from January 2019 until December 2019, CEO from December 2010 until December 2018, and as Chairman of Pfizer's Board from December 2011 to December 2018. Kilts and Cornwell were members of Pfizer's

---

[4] The FW Cook Survey defines a large cap company as one with a market capitalization of $10 billion or greater.

compensation committee which approved millions in compensation for Read during his tenure at Pfizer.[5]

140.     Cornwell, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Cornwell utterly failed to perform these essential duties.

141.     Cornwell, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company. Cornwell utterly failed to perform these essential duties.

142.     Cornwell, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

143.     Cornwell is neither independent nor disinterested. Any demand upon Defendant Cornwell is futile and, thus, excused.

### *Defendant Coury*

144.     Defendant Coury has served as Viatris' Executive Chairman since the closing of the Merger. Coury therefore is not independent. Indeed, Viatris' 2022 Proxy Statement does not list Coury as an independent director.

---

[5] Jim Edwards, *Pfizer CEO Got $17.4M After 26 Days on the Job, CBS News,* March 23, 2011, https://www.cbsnews.com/news/pfizer-ceo-got-174m-after-26-days-on-the-job/.

145.     As an employee of Viatris, the Company provides Defendant Coury with his principal occupation from which he receives substantial compensation.  In 2021 and 2020, Coury received total compensation packages of $18,552,078 and $29,057,376, respectively.  Thus, Coury could not consider a demand for action that might require him to sue the directors who control his continued employment or fellow members of management with whom he works on a day-to-day basis.

146.     Coury authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

147.     According to the 2022 Proxy Statement, the Coury Firm LLC, the principals of which are close relatives of Defendant Coury, provides services to Mylan Inc, a subsidiary of Viatris, and receives substantial compensation in exchange for these services:

> The Coury Firm LLC (together with its predecessors, "TCF") provides certain services to Viatris and its subsidiaries pursuant to a contract between Mylan Inc., a subsidiary of Viatris, and TCF.  The principals of TCF are brothers and a son of [Coury], Executive Chairman, and TCF is beneficially owned by brothers and trusts on behalf of brothers and children of [Coury].  TCF is in the business of providing strategic corporate benefits advice and services, among others.  Since approximately 1995, TCF and, in the past, other affiliated entities of TCF, served as the broker in connection with several of Mylan's and, since the closing of the Combination, Viatris' employee benefit programs. Commencing on September 1, 2020, the parties extended their agreement through December 31, 2023 on substantially the same terms as their prior arrangement, which included a fixed base fee of $37,500 per month to be paid by Mylan to TCF, corresponding to the term of agreements negotiated with certain benefit plan carriers and capping payments over that time period.  However, where required by law, TCF will continue to receive commissions directly from certain other benefit plan carriers, and in 2021 and through September 30, 2022, received payments totaling approximately $310,000 in commissions for these services directly from the insurance carriers (including payments for 2020 business paid in 2021.

148.     Coury has a business relationship with several of the Individual Defendants including Dimick, Dillon, Higgins, Parrish, Korman, Malik, Mark, and van der Meer Mohr which prevents him from acting in an independent and disinterested manner.  Coury was CEO of Mylan

from September 2002 until January 2012, a member of the Board of Directors of Mylan from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan. Coury also served as a strategic advisor to Mylan from 1995 through 2002. Malik served most recently as President of Mylan and in several other senior leadership roles from 2007 until the closing of the Merger. Defendants Dimick, Dillon, Higgins, Parrish and Korman were members of the Mylan Board together for over six years. Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period. Defendant Korman served on the Mylan Board for two years during this period and served in several leadership roles at Mylan since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and as a consultant from July 2014 to July 2015. Mark was a member of the Mylan Board for one year before joining the Viatris Board.

149. Defendants Coury and Mark have a business relationship through their work at Goldman Sachs. Defendant Coury serves on the Goldman Sachs Healthcare Advisory Council, which offers external strategic, operational and subject matter expertise for Goldman Sachs' global private healthcare investing platform. Mark serves on the Boards of Goldman Sachs BDC, Inc., Goldman Sachs Private Credit Fund, LLC, and Goldman Sachs Middle Market Lending Corp. II.

150. Coury, as a director of Viatris, was required to, but failed to (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospect; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Coury is neither independent nor disinterested. Any demand upon Defendant Coury is futile and, thus, excused.

### Defendant Dillon

151.     Dillon received $400,003 in 2021 in compensation in the form of fees and stock awards for her service as a director in 2021.  Dillon earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000.  As such, Dillon earns approximately 40% more than an average director at a similarly sized company.

152.     Dillon authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

153.     Dillon has a business relationship with several of the Individual Defendants including Coury, Dimick, Higgins, Parrish, Korman, Malik, Mark, and van der Meer Mohr which prevents her from acting in an independent and disinterested manner.  Defendants Dillon, Dimick, Higgins, Parrish were members of the Mylan Board together for over six years. Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period. Defendant Mark was a member of the Mylan Board for one year before joining the Viatris Board. Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015. Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan.  Coury also served as a strategic advisor to Mylan from 1995 through 2002.  Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.

154.     Dillon, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Dillon utterly failed to perform these essential duties.

155.     Dillon, as Chair of the Governance and Nominating Committee, had the duty, among others, to ensure the implementation and effectiveness of Viatris' Corporate Governance Principles.  Dillon utterly failed to perform these duties.

156.     Dillon, as a member of the Compliance Committee, had duties regarding oversight over the effectiveness and implementation of the Company's Global Compliance Program and to prevent and respond to significant actual and alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations.  Dillon utterly failed to perform these essential duties.

157.     Dillon, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

158.     Dillon is neither independent nor disinterested.  Any demand upon Defendant Dillon is futile and, thus, excused.

### *Defendant Higgins*

159.     Higgins received $445,003 in 2021 in compensation in the form of fees and stock awards for service as a director in 2021.  Higgins earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW

Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000. As such, Higgins earns approximately 50% more than an average director at a similarly sized company.

160.    Higgins authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

161.    Higgins has a business relationship with several of the Individual Defendants including Coury, Dillon, Dimick, Parrish, Korman, Malik, Mark and van der Meer Mohr which prevents her from acting in an independent and disinterested manner. Defendants Dillon, Dimick, Higgins, Parrish were members of the Mylan Board together for over six years. Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period. Mark was a member of the Mylan Board for one year before joining the Viatris Board. Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015. Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger. and served most recently as Executive Chairman of Mylan. Coury also served as a strategic advisor to Mylan from 1995 through 2002. Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.

162.    Higgins, as a member of the Governance and Nominating Committee, had the duty, among others, to ensure the implementation and effectiveness of Viatris' Corporate Governance Principles. Higgins utterly failed to perform these duties.

163.    Higgins, as a director of Viatris, was required to, but failed to: (1) implement and

maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

164.    Higgins is neither independent nor disinterested.  Any demand upon Defendant Higgins is futile and, thus, excused.

### ***Defendant Kilts***

165.    Kilts received $370,003 in 2021 in compensation in the form of fees and stock awards for service as a director in 2021.  Kilts earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000.  As such, Kilts earns more than 32% more than an average director at a similarly sized company.

166.    Kilts authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

167.    Kilts has a long-standing business relationship with several of the Individual Defendants including Goettler, Read, and Cornwell, which prevents him from acting in an independent and disinterested manner.  Kilts and Cornwell were members of the Pfizer Board from 1997 until the Merger.  Defendant Goettler served in various leadership roles at Pfizer since 2012, including his most recent role as Group President of Pfizer's Upjohn division from 2019 until the closing of the Merger.  Defendant Read served in leadership roles in his more than forty years at Pfizer, serving as Executive Chairman from January 2019 until December 2019, CEO from

December 2010 until December 2018, and as Chairman of Pfizer's board of directors from December 2011 to December 2018. Kilts and Cornwell were members of Pfizer's compensation committee which approved millions in compensation for Read during his tenure at Pfizer.[6]

168.     Kilts, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

169.     Kilts is neither independent nor disinterested. Any demand upon Defendant Kilts is futile and, thus, excused.

### *Defendant Korman*

170.     Korman received $375,003 in 2021 in compensation in the form of fees and stock awards for service as a director in 2021. Korman earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000. As such, Korman earns approximately 34% more than an average director at a similarly sized company.

171.     Defendant Korman has a business relationship with several of the Individual Defendants including Coury, Dimick, Dillon, Higgins, Parrish, Malik, Mark, and van der Meer Mohr which prevents him from acting in an independent and disinterested manner. Defendants Dillon, Dimick, Higgins, Parrish were members of the Mylan Board together for over six years.

---

[6] *See* footnote 5, *supra.*

Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period. Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015. Defendant Korman's son had a paid internship with a Mylan subsidiary during the summer of 2019.  Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan.  Coury also served as a strategic advisor to Mylan from 1995 through 2002. Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.

172.    Korman authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

173.    Korman benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Viatris Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

174.    Korman, as a member of the Governance and Nominating Committee, had the duty, among others, to ensure the implementation and effectiveness of Viatris' Corporate Governance Principles.  Korman utterly failed to perform these duties.

175.    Korman, as a member of the Compliance Committee, had duties regarding oversight over the effectiveness and implementation of the Company's Global Compliance Program and to prevent and respond to significant actual and alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations. Korman utterly failed to perform these essential duties.

176.     Korman, as Chair of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company.  Korman utterly failed to perform these essential duties.

177.     Korman, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

178.     Korman is neither independent nor disinterested.  Any demand upon Defendant Korman is futile and, thus, excused.

### *Defendant Malik*

179.     Defendant Malik has served as Viatris' President and as a member of the Board since the closing of the Merger.  Malik therefore is not independent.  Indeed, Viatris' 2022 Proxy Statement does not list Malik as an independent director.

180.     As an employee of Viatris, the Company provides Defendant Malik with his principal occupation from which he receives substantial compensation.  In 2021 and 2020, Malik received total compensation packages of $11,622,250 and $14,101,983, respectively.  As of October 24, 2022, Malik owned 881,315 Viatris shares worth approximately $9 million at the current Viatris stock price.  Thus, Malik could not consider a demand for action that might require him to sue the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

181.     Malik authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

182.     Malik benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Viatris Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

183.     Malik has a business relationship with several of the Individual Defendants including Coury, Dillon, Dimick, Higgins, Parrish, Korman, and van der Meer Mohr which prevents him from acting in an independent and disinterested manner.  Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.  Defendants Dillon, Dimick, Higgins, Parrish were members of the Mylan Board together for over six years. Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period.  Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015.  Mark was a member of the Mylan Board for one year before joining the Viatris Board.  Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan.  Coury also served as a strategic advisor to Mylan from 1995 through 2002.

184.     According to the 2022 Proxy Statement, Viatris has made substantial payments to Malik's counsel in connection with drug pricing matters:

Viatris has made payments to counsel to Mr. Malik of approximately $1.6 million from January 1, 2021 through September 30, 2022 for services provided to Mr. Malik in connection with certain previously disclosed drug pricing matters. The Company anticipates making additional payments of approximately $180,000 in 2022 for ongoing services to be provided to Mr. Malik in connection with such matters. Viatris anticipates additional payment, repayment or advancement of these and other expenses during the pendency of these matters and anticipates that it will make payments for any such claims.

185.     Malik, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

186.     Malik is neither independent nor disinterested. Any demand upon Defendant Malik is futile and, thus, excused.

### *Defendant Mark*

187.     Mark received $370,003 in 2021 in compensation in the form of fees and stock awards for his service as a director in 2021. Mark earns compensation far in excess of the compensation that directors earn at equivalently sized companies. For example, according to FW Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000. As such, Mark earns more than 32% more than an average director at a similarly sized company.

188.     Mark authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

189.     Mark benefited from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Viatris Board through the false and misleading statements

and material omissions in the 2022 Proxy Statement.

190.     Mark has a business relationship with several of the Individual Defendants including Coury, Dillon, Dimick, Higgins, Korman, Malik, van der Meer Mohr, and Parrish which prevents him from acting in an independent and disinterested manner.  Mark was a member of the Mylan Board for one year before joining the Viatris Board. Defendants Parrish, Dillon, Dimick, and Higgins were members of the Mylan Board together for over six years. Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period. Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015. Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan.  Coury also served as a strategic advisor to Mylan from 1995 through 2002.  Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.

191.     Defendants Mark and Coury have a business relationship through their work at Goldman Sachs.  Mark serves on the Boards of Goldman Sachs BDC, Inc., Goldman Sachs Private Credit Fund, LLC, and Goldman Sachs Middle Market Lending Corp. II.  Defendant Coury serves on the Goldman Sachs Healthcare Advisory Council, which offers external strategic, operational and subject matter expertise for Goldman Sachs' global private healthcare investing platform.

192.     Mark, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company.  Cornwell utterly failed

to perform these essential duties.

193.     Mark, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

194.     Mark is neither independent nor disinterested.  Any demand upon Defendant Mark is futile and, thus, excused.

### *Defendant Parrish*

195.     Parrish received $450,003 in 2021 in compensation in the form of fees and stock awards for his service as a director in 2021.  Parrish earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000.  As such, Parrish earns approximately 51% more than an average director at a similarly sized company.

196.     Parrish authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

197.     Parrish has a business relationship with several of the Individual Defendants including Coury, Dillon, Dimick, Higgins, Korman, Malik, Mark, and van der Meer Mohr which prevents him from acting in an independent and disinterested manner.  Defendants Parrish, Dillon, Dimick, and Higgins were members of the Mylan Board together for over six years. Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period.

Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996, including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015. Mark was a member of the Mylan Board for one year before joining the Viatris Board. Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan. Coury also served as a strategic advisor to Mylan from 1995 through 2002. Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.

198.     Parrish, as a member of the Audit Committee, had duties regarding oversight of the risks facing the Company and Viatris' compliance with relevant laws, rules, and regulations. Parrish utterly failed to perform these essential duties.

199.     Parrish, as a member of the Governance and Nominating Committee, had the duty, among others, to ensure the implementation and effectiveness of Viatris' Corporate Governance Principles. Parrish utterly failed to perform these duties.

200.     Parrish, as Chair of the Compliance Committee, had duties regarding oversight over the effectiveness and implementation of the Company's Global Compliance Program and to prevent and respond to significant actual and alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations. Parrish utterly failed to perform these essential duties.

201.     Parrish, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate,

and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

202.     Parrish is neither independent nor disinterested.  Any demand upon Defendant Parrish is futile and, thus, excused.

### Defendant van der Meer Mohr

203.     Defendant van der Meer Mohr received $350,003 in 2021 in compensation in the form of fees and stock awards for service as a director in 2021.  Defendant van der Meer Mohr earns compensation far in excess of the compensation that directors earn at equivalently sized companies.  For example, according to FW Cook's 2021 director compensation survey, the average director compensation per year at a large cap company in the 25th percentile like Viatris is $266,000.  As such, van der Meer Mohr earns approximately 27% more than an average director at a similarly sized company.

204.     Defendant van der Meer Mohr authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability, therefore.

205.     Defendant van der Meer Mohr has a long-standing business relationship with several of the Individual Defendants including Coury, Dillon, Dimick, Higgins, Korman, Malik, Mark, and Parrish which prevents her from acting in an independent and disinterested manner. Defendants Parrish, Dillon, Dimick, and Higgins were members of the Mylan Board together for over six years.  Defendant van der Meer Mohr also served as a member of the Mylan Board for two years during this period.  Defendant Korman was on the Mylan Board for two years during this period and also served in several leadership roles at Mylan, since he joined Mylan in 1996,

including as Mylan's global Chief Operating Officer and served as a consultant for Mylan Inc. from July 2014 to July 2015.  Mark was a member of the Mylan Board for one year before joining the Viatris Board. Coury was CEO of Mylan from September 2002 until January 2012, a member of the Mylan Board from 2002 until the closing of the Merger and served most recently as Executive Chairman of Mylan.  Coury also served as a strategic advisor to Mylan from 1995 through 2002.  Malik served most recently as President of Mylan and in several other senior leadership rules from 2007 until the closing of the Merger.

206.    Defendant van der Meer Mohr, as a member of the Compliance Committee, had duties regarding oversight over the effectiveness and implementation of the Company's Global Compliance Program and to prevent and respond to significant actual and alleged violations of the Code of Business Conduct and Ethics, corporate policies and procedures, and applicable laws and regulations.  Defendant van der Meer Mohr utterly failed to perform these essential duties.

207.    Defendant van der Meer Mohr, as a member of the Risk Oversight Committee, had duties regarding oversight of the Company's overall risk framework, and was responsible for identifying, measuring, monitoring, and controlling the key risks facing the Company.  Defendant van der Meer Mohr utterly failed to perform these essential duties.

208.    Defendant van der Meer Mohr, as a director of Viatris, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls.

209.    Defendant van der Meer Mohr is neither independent nor disinterested.  Any demand upon Defendant van der Meer Mohr is futile and, thus, excused.

**_Scott A. Smith_**

210.    As CEO of the Company since April 1, 2023, Smith is not independent or disinterested.

211.    As an employee of Viatris, the Company provides Smith with his principal occupation from which he receives substantial compensation including a base salary of $1,400,000, a target bonus of 150% of his base salary, annual grants of long-term incentive awards amounting to as much as 800% of his base salary, and substantial benefits.  Thus, Smith could not consider a demand for action that might require him to sue the directors who control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

212.    Smith is neither independent nor disinterested.  Any demand upon Smith is futile and, thus, excused.

**_Other Reasons Demonstrating That Demand Upon the Viatris Board is Excused_**

213.    Viatris has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

214.    The members of the Viatris Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

215.    Publicly traded companies, such as Viatris, typically carry director & officer

liability insurance from which the Company could potentially recover some or all its losses.

## FIRST CLAIM

### Against the Individual Defendants for Violations of Section 14(a)
### of the Exchange Act

216.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

217.    Section 14(a) claim alleged herein is based solely on negligence.  It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to, any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

218.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

219.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

220.    Under the direction and watch of the Individual Defendants, the 2022 Proxy

Statement failed to disclose that the Individual Defendants violated their fiduciary duties to Viatris and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. Further, the Proxy Statement contained false and misleading statements related to risk oversight by the Board and the Company's commitment to strong corporate governance principles.

221.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading and omitted material information.

222.    The false and misleading statements in, and information omitted from, the 2022 Proxy Statement was material to Viatris' shareholders in determining whether to, among other things, elect Defendants Cornwell, Korman, Malik, and Mark to the Board and approve the 2021 executive compensation.

223.    The material misstatements and omissions in the Proxy Statement damaged Viatris.

224.    Plaintiff, on behalf of Viatris, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of Defendants Cornwell, Korman, Malik, and Mark and the approval of the 2021 executive compensation.

225.    Plaintiff on behalf of Viatris has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

225. Plaintiff incorporates by reference and realleges each allegation contained above, as though fully set forth herein.

226. The Individual Defendants owed and owe fiduciary duties to Viatris. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Viatris the highest obligation of good faith and loyalty in the administration of Viatris' affairs. The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Viatris alleged herein.

227. The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their recurrence.

228. The Individual Defendants each violated their fiduciary duties to Viatris and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Viatris' core operations and making truthful, accurate, and complete statements regarding its core operations, financial condition, and business prospects; (2) effectively oversee and monitor the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct or the lack of internal controls. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Viatris has sustained and continues to sustain significant damages and its reputation has been irreparably damaged.

229. As a result of the misconduct alleged herein, the Individual Defendants are liable

to the Company.

230.     Plaintiff on behalf of Viatris has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Contribution for Violations
of 21D of the Exchange Act**

230.     The conduct of the Individual Defendants, as described herein, has exposed the Company to significant liability under various federal securities laws by their misconduct.

231.     Viatris is named as a defendant in related securities class action lawsuits that allege and assert claims arising under the federal securities laws.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If Viatris is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Individual Defendants as alleged herein, who have caused the Company to suffer substantial harm through their misconduct.  The Company is entitled to contribution and indemnification from the Individual Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

232.     As officers and directors, the Individual Defendants had the power or ability to, and did, control or influence, either directly or indirectly, Viatris' general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

233.     The Individual Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

234.     The Individual Defendants have damaged the Company and are liable to the

Company for contribution.

## FOURTH CLAIM

### Against the Individual Defendants for Aiding and Abetting

235.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

236.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

237.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

238.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

239.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

240.    Plaintiff on behalf of Viatris has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in Viatris' favor against all Individual Defendants, as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Viatris and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants violated §§14(a) and 21D of the Exchange Act;

(c)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Viatris;

(d)     Directing Viatris to take all necessary actions to implement and maintain an effective system of internal controls and meaningful Board oversight and monitoring;

(e)     Determining and awarding to Viatris the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(f)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(g)     Awarding Viatris restitution from the Individual Defendants, and each of them;

(h)     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(i)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Date: August 28, 2023                    **LAW OFFICE OF LEON AUSSPRUNG, MD, LLC**

                                         */s/ James E. Hockenberry*
                                         James E. Hockenberry
                                         1800 John F. Kennedy Boulevard
                                         Suite 1500
                                         Philadelphia, PA  19103
                                         Telephone: (215) 717-0744
                                         Facsimile: (888) 800-5731
                                         Email: JH@aussprunglaw.com

                                         **THE ROSEN LAW FIRM, P.A.**
                                         Phillip Kim
                                         275 Madison Avenue, 40th Floor
                                         New York, NY 10016
                                         Telephone: (212) 686-1060
                                         Facsimile: (212) 202-3827
                                         Email: pkim@rosenlegal.com

                                         *Counsel for Plaintiff*

## <u>VERIFICATION</u>

        I, Don Masters am a plaintiff       in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct. Executed this    8/23/2023 .

Don Masters